**Edgar T. EDGERTON, Respondent,**

v.

**Stephen K. MORRISON, M.D., et al., Appellants.**

**No. SC 89762.**

Supreme Court of Missouri, En Banc.

April 14, 2009.

Gary Cunningham, Darylnne L. O'Neal, Lathrop & Gage LLP, Springfield, MO, for Appellants.

David W. Ransin, David W. Ransin, P.C., Springfield, MO, for Respondent.

MARY R. RUSSELL, Judge.

Edgar T. Edgerton ("Patient") sued Stephen K. Morrison, M.D., a cardiothoracic surgeon, and Ferrell–Duncan Clinic (collectively, "Surgeon")[1] for damages resulting from a negligent diagnosis of his sternum after heart surgery. The trial court entered judgment against Surgeon after a jury verdict. He appealed. Among his allegations of error, he claims that language contained in the verdict director resulted in a "roving commission" and that the verdict form was modified improperly.

This Court granted transfer pursuant to article V, section 10 of the Missouri Constitution after disposition by the court of appeals. Because the verdict director, verdict form, and damages instruction were proper and the evidence of causation was sufficient, this Court affirms the circuit court's judgment.

## I. Background

Patient was referred to Surgeon for cardiac bypass surgery after suffering a heart attack.[2] As a part of this surgery, Surgeon cut and spread Patient's sternum, termed a "sternotomy," to operate on his heart. Afterward, he wired the sternum back together. Patient recovered sufficiently from this operation to be discharged from the hospital, and he visited Surgeon for a scheduled postoperative examination a few weeks later. At this visit, Patient complained of a rash over the surgical wound and of a "gritting" in his chest, and he related that two days prior one of his ribs had temporarily popped out of place. Surgeon palpated his sternum

---

1. Patient also brought claims against other physicians and their employers, several of which were dismissed earlier in the litigation, and the jury found in favor of all remaining defendants except for Surgeon.

2. The bypass surgery involved diverting an internal mammary artery that had supplied blood to the sternum to instead supply blood to the heart. Patient's expert testified that Surgeon's use of this technique was proper.

and concluded that it was stable. Later, an admitting cardiologist referred Patient to a dermatologist for treatment of the rash. Patient complained of new and continuing chest pains, and the dermatologist referred Patient back to Surgeon, who again palpated Patient's sternum, determining that it was well-healed.

Several days later, Patient sought a second opinion from Dr. Lundman, a general surgeon, who diagnosed him as having an unstable sternum with possible infection. He referred Patient to a new cardiothoracic surgeon, Dr. Rogers ("Rogers"), who agreed that his sternum was unstable. Rogers operated soon thereafter and, on opening Patient's chest, discovered that his sternum was mostly destroyed and was liquefying, which is termed "necrotic." He cut away the dead portions to expose viable tissue. This resulted in the removal of most of Patient's sternum. The state of the sternum led Rogers to suspect infection, which was one of several possible causes of the damage. He left the wound open, awaiting laboratory results from the wound's tissue samples. When no infection was indicated after 48 hours, a plastic surgeon closed the wound using the pectoralis flap procedure, where a portion of Patient's pectoralis muscle was moved to where the liquefied portion of the sternum had been.

The pectoralis flap procedure is recommended when infection is suspected because it allows for antibiotic transmission through blood flow. But, in this case, no infection ever arose because the cause of the necrosis was bone death, or aseptic vascular necrosis, caused in part by the arterial blood supply diversion performed during the bypass surgery and in part by Patient's particular physical characteristics. But, at the time of the flap procedure, Rogers and the plastic surgeon stat-

ed that they still were concerned about the possibility of infection, and Patient's expert witness confirmed that the flap procedure was the safest choice when infection is suspected. The plastic surgeon also stated that, regardless of infection, the flap procedure is the method he typically used to close sternal non-unions. Nevertheless, Patient's expert testified that two potential rigid repairs, a rib transfer and a methylmethacrylate procedure using mesh ("mesh procedure"), were preferable when there is not an infection, stating that the flap procedure does not protect the heart or stabilize the ribs and skeleton.

Patient sued several defendants.[3] The portion of the suit relating to Surgeon alleged that he was negligent in failing to properly diagnose and treat the splitting and instability of Patient's sternum, which ultimately led to his undergoing the flexible-type repair using muscle flap instead of a preferable rigid or solid repair through the rib transfer or mesh procedures. Patient claims that failure to have the rib transfer or mesh procedures has negatively affected his daily tasks, has caused him physical pain during certain activities, and has made future surgeries more risky.

## II. Analysis

### A. Verdict director, verdict form, and damages instruction were proper.

■■■ Whether a jury was properly instructed is a question of law that this Court reviews *de novo*. *Bach v. Winfield–Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008). An issue submitted by an instruction must be supported by the evidence. *Oldaker v. Peters*, 817 S.W.2d 245, 251 (Mo. banc 1991). In making this determination as to a particular instruc-

---

**3.** Patient did not bring claims against Rogers or the plastic surgeon.

tion, this Court views the evidence in the light most favorable to its submission. *Bach,* 257 S.W.3d at 608. Reversal for instructional error is appropriate when the instruction misdirected, misled, or confused the jury and resulted in prejudice. *Sorrell v. Norfolk S. Ry. Co.,* 249 S.W.3d 207, 209 (Mo. banc 2008).

### 1. Verdict Director

■ Surgeon claims that a verdict director's improper use of the amorphous term "rigid fixation" created a "roving commission." *See Hustad v. Cooney,* 308 S.W.2d 647, 650 (Mo.1958) (relating one definition of a "roving commission" as "an abstract instruction . . . in such broad language as to permit the jury to find a verdict without being limited to any issues of fact or law developed in the case"). The challenged verdict director, Instruction No. 11, stated in relevant part,

> Your verdict must be for [Patient] and against [Surgeon] if you believe:
>
> First, [Surgeon] failed to diagnose and treat [Patient's] unhealed sternum with *rigid fixation* . . . and
>
> Second, [Surgeon] was thereby negligent, and
>
> Third, such negligence directly caused or directly contributed to cause damage to [Patient].

(emphasis added).

Surgeon points out that the term "rigid fixation" was not defined for the jury in the instructions, nor was it explicitly defined during the presentation of evidence. Further, he argues that the term encompassed other repairs, including sternal rewiring, whereas testimony at trial was that only two specific types of repair were available: rib transfer and mesh procedures. As such, he claims that this instruction failed to properly track the expert testimony, analogizing to *Grindstaff v. Tygett,* 655 S.W.2d 70, 73 (Mo.App.1983)

(verdict director stating guideline of "not medically proper" gave the jury "no factual guideline or standard to determine negligence"). He argues this error prejudiced him and merits reversal.

The issue here is whether the term "rigid fixation" as used in the verdict director was misleading in context. Both parties elicited testimony that only two types of rigid stabilizing procedures were available in Patient's circumstances: the rib transfer and mesh procedures. At trial, multiple witnesses agreed that rewiring the sternum, a third type of rigid repair, was not available to Patient. The attorneys' arguments were consistent with this testimony. Although the term "rigid fixation" was used only twice during the presentation of evidence, both times in the context of a cross-examiner's question, synonymous terms such as "solid repair," "rigid repair," and "rigid fix" were repeatedly invoked.

When determining whether the term "rigid fixation" misled the jury, this Court is bound to review the supporting evidence in the light most favorable to submission of the instruction. *Bach,* 257 S.W.3d at 608. Surgeon argues that because it was undisputed that only two types of rigid stabilizations were available, it follows that this more general term allowed the jury to award damages on an improper basis. But, this Court has stated that a technical amount of detail is not required for a jury to be properly informed of the meaning of expert terminology. *See Hickman v. Branson Ear, Nose, & Throat, Inc.,* 256 S.W.3d 120, 123 (Mo. banc 2008) (modern questioning of experts is "simpler, more direct, and less formulaic than in the past"). This view is consistent with the basic premise of Missouri Approved Instructions, which is to submit only ultimate issues and avoid evidentiary detail in instructions. *See Dunn v. St. Louis–San*

*Francisco Ry. Co.*, 621 S.W.2d 245, 255 (Mo. banc 1981).

Applied here, this is not a case where there was no factual guideline and the jury was thereby misled; rather, an encompassing term was employed—"rigid fixation"—that, in context, the jury would have properly understood to mean the rib transfer and mesh procedures. *Compare Hickman*, 256 S.W.3d at 123 (substance of expert's answers provided jury with an explanation of the standard of care even though the technical legal standard was not stated verbatim), and *Spain v. Brown*, 811 S.W.2d 417, 420 (Mo.App.1991) (verdict director's language "wrong location" gave factual guideline when it was clear from expert testimony that this referenced "two finger widths down from the bony knob"), with *Grindstaff*, 655 S.W.2d at 73 ("not medically proper" was not a factual guideline when it was unclear which error it referenced among several). Indeed, the trial judge allowed this instruction to be used with the benefit of firsthand knowledge of how the evidence was presented at trial and, without indications to the contrary, it should not be assumed that he did so carelessly. It was clear from the evidence that "rigid fixation" referred to the two types of rigid stabilizing procedures—rib transfer and mesh procedures—that were available to the patient.

**2. Verdict form**

■ Surgeon's next allegation of error is that the verdict form was improperly modified because it failed to follow MAI 36.21,[4] which in turn misled the jury. Here, the verdict form stated in relevant part,

4. All references to MAI are to the 6th edition.

5. MAI 36.21's form provides: "On the claim of plaintiff (state the name) for personal injuries against defendant (state the name), we,

On the claim of [Patient] for personal injuries against [Surgeon], *as submitted by Instruction No. 11*, we, the undersigned jurors, find in favor of . . .

(emphasis added).[5]

Surgeon argues that the phrase "as submitted by Instruction No. 11" was an impermissible modification of MAI 36.21 in that it drew attention to that instruction to the exclusion of all others. He points to Rule 70.02(b), which states that "[w]henever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject." It also provides that "[w]here an MAI must be modified to fairly submit the issues in a particular case . . . then such modifications or such instructions shall be simple, brief, impartial, free from argument. . . ." An applicable MAI's use is mandatory. *See Karashin v. Haggard Hauling & Rigging Inc.*, 653 S.W.2d 203, 206 (Mo. banc 1983).

■ Missouri courts have found that a verdict form is not an instruction. *See Mathes v. Sher Express, LLC*, 200 S.W.3d 97, 105 (Mo.App.2006) ("A verdict form, however, is not an 'instruction,' but merely 'the medium to record the decision of the jury.' "). Regardless, a verdict form, like an instruction, should not misdirect, mislead, or confuse the jury. *See, e.g., Bowan ex rel. Bowan v. Express Med. Transporters, Inc.*, 135 S.W.3d 452, 462 (Mo.App. 2004) (applying the "mislead or confuse" standard to an instruction and its corresponding verdict form).

the undersigned jurors, find in favor of . . ." The only deviation here was the addition of the clause "as submitted by Instruction No. 11."

Here, it is apparent that the additional language "as submitted by Instruction No. 11" did not mislead the jury, but rather this identifying language simply referred the jury to the verdict director that corresponded to each defendant. This is clear when viewed in context of the verdict form's statements of the parallel liability claims against the other defendants, which each contained a similar descriptive phrase for each defendant. In no other respect was the verdict form modified. As such, this addition was akin to a descriptive phrase pursuant to MAI 36.21's Notes on Use 2,[6] which states,

> The verdict form will contain a descriptive phrase describing and identifying the claim submitted by this particular package, which will be the claim to which this verdict is applicable. The identifying phrase should be non-inflammatory and as neutral as possible and should avoid the assumption of disputed facts.

This Court finds no indication that the identifying phrase "as submitted by Instruction No. 11" misdirected, misled, or confused the jury.

### 3. Damages Instruction

 Surgeon also challenges Instruction No. 15, stating that its language allowed for damages not attributable to him. Instruction 15 stated in relevant part,

> If you find in favor of [Patient], then you must award [Patient] such sum as you believe will fairly and justly compensate [Patient] for any damages you believe he sustained and is reasonably certain to

sustain in the future that the conduct of one or more of the defendants *as submitted in Instruction Numbers 7, 9, 11, and 13* directly caused or contributed to cause.[7]

(emphasis added).

Surgeon does not cite any authority on point for the proposition that this instruction was error. The jury did not find any other defendant liable for damages pursuant to the other instructions. Further, the jury was instructed according to MAI 2.03, which states that the jury should harmonize instructions, considering and applying them as a whole. It must be assumed that the jury did so here.

### B. Evidence supports causation.

Surgeon appeals the denial of his motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial. This Court limits its review to determining if the evidence was sufficient to support the jury's verdict, viewing it in the light most favorable to the verdict. *Clevenger v. Oliver Ins. Agency, Inc.,* 237 S.W.3d 588, 590 (Mo. banc 2007). This review gives Patient the benefit of all reasonable inferences and disregards conflicting evidence and inferences. *Id.*

A *prima facie* case of medical malpractice consists of three general elements: (1) an act or omission of the defendant failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently; and (3) the act or omission caused the plaintiff's injury.

---

6. Even assuming the descriptive phrase was construed as a modification, under no standard would this additional language amount to prejudice. Also, Surgeon's argument is incorrect that Notes on Use 2 for MAI 36.21 could not apply in this case because the verdict form was not "packaged" as defined by MAI 2.00. On the contrary, MAI 2.00 ex-

plains packaging to include cases in which there is only one verdict form, as is the case here.

7. Instructions Nos. 7, 9, 11, and 13 each refer to the negligence claims against particular defendants.

*Sundermeyer v. SSM Reg'l Health Servs.,* 271 S.W.3d 552, 554 (Mo. banc 2008).

Surgeon challenges the third element, causation. He states that the alleged negligence—a failure to properly diagnosis the state of Patient's sternum—was not a "but for" cause of injury because Patient would have undergone the pectoralis flap procedure regardless of when his sternum's condition was diagnosed.[8] Surgeon argues that it was error to deny his motions for directed verdict and JNOV because Patient failed to present evidence of a causal connection between his injury and Surgeon's alleged negligence.

▆▆ Here, this Court's review of the jury verdict is limited to viewing evidence in support of causation, and it must uphold the verdict unless "there is a complete absence of probative fact." *See Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 250 (Mo. banc 2006).

Patient's theory of causation was that, but for Surgeon's misdiagnosis, he would have had more desirable options for treating his split and liquefying sternum. Patient asserted that as a result of Surgeon's negligence, he was forced to seek consultation from a new surgeon, Rogers, who then operated without firsthand knowledge of Patient's wound's history. As such, Rogers was compelled to assume that infection was possible, and he left the wound open for testing. Presented with this timeframe for testing and the possibility of infection, a repair procedure was then limited to the flexible repair, as was recommended for such circumstances. But, Patient's sternum was not infected. If known, he claimed, this fact would have allowed for the two alternative rigid repairs.[9]

In support of this theory, Patient presented evidence from an expert witness who testified that his opinions were given to a reasonable degree of medical certainty. *See Sundermeyer,* 271 S.W.3d at 556 (expert testimony must be given to a reasonable degree of certainty to support causation). This testimony included that, in the event of an infection, a surgeon is almost always committed to a muscle flap procedure. He stated that Rogers, who was presented with a first-time patient showing surgical-wound redness and a dissolved sternum, reasonably attributed this to an infection. In these circumstances, he said that Rogers acted practically by cutting away dead tissue and recommending that the plastic surgeon perform a flap procedure. The expert contrasted this to what Surgeon would have known from Patient's previous history. He testified that his familiarity would have enabled Surgeon to know that the wound was not infected; in turn, a rigid reconstruction procedure would have been an option. The testimony included that a rib transfer or mesh procedure were preferable and would have restored the structural integrity of the sternum as opposed to having a flexible, soft repair from muscle. Finally, the expert testified that he had in fact performed the procedures himself.

8. Surgeon splits this argument into two parts, challenging causation generally and challenging causation as to the later consultation in particular. The second part alleges that any negligence in the later consultation could not have caused Patient injury because he in fact underwent surgery several days later. But Patient's theory of causation was unrelated to the timing of the diagnosis; rather, it related to the fact that the second surgeon (Rogers) did not have firsthand knowledge of the bypass surgery and the sternotomy wound's history. As such, these two parts may be addressed together.

9. There was testimony that Patient could have had the rigid repairs performed later but that it would have posed unreasonable health risks.

Viewing this evidence under the proper standard of review, and ignoring contrary evidence, it cannot be said that "there is a complete absence of probative fact" regarding the element of causation. *See Stehno,* 186 S.W.3d at 250. The testimony supports the theory that, but for Surgeon's negligence in diagnosis, Patient would have had the opportunity to undergo a preferable repair procedure. As such, Surgeon's causation arguments fail.

### III. Conclusion

The circuit court's judgment is affirmed.

All concur.